IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No: 07-CR-10-JHP |
| | ) |
| CHRISTOPHER GOODLETT, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Referred to the undersigned for report and recommendation is the Motion to Suppress filed by Defendant Christopher Goodlett ("Goodlett") (Dkt. #9). Goodlett has been indicted for Felon in Possession of a Firearm and Ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and Possession of Unregistered Firearm in violation of 26 U.S.C. §§ 5861(d) and 5871. (Dkt. #2). Goodlett alleges that the loaded firearm and drug paraphernalia taken from his person by police on November 28, 2006 should be suppressed as the officers did not have sufficient cause to initiate the stop. The Court held a hearing on the motion on February 28, 2007. Upon consideration of the testimony of Tulsa Police Officer Keith Osterdyk ("Osterdyk"), and 911 Operator Michael Ryder ("Ryder), the exhibits, the stipulation of the parties and briefs, the Court recommends that the motion be **DENIED**.

### Factual Background

On November 28, 2006 at approximately 12:06 a.m. a call was received by 911 Operator Ryder from Natasha Galle ("Galle") who reported that her ex-husband was trying to break into her house in violation of a protective order. Ryder asked Galle for her address, which Galle identified as 619 E. 54th Place North. Ryder also asked Galle what color shirt her ex-husband

was wearing and she responded "blue." Ryder conveyed the information to the dispatcher who dispatched Tulsa Police Officers Osterdyk and Brandon Smith ("Smith") to Galle's residence to investigate.

Osterdyk testified that he arrived at the scene approximately 12:13 a.m. and interviewed Galle. He reported that Galle told him that her ex-husband, Darryl Celius ("Celius"), had attempted to break in the front window of her house and threatened her by saying "I'm going to kill you and if I don't do it I am going to send my posse after you." She said she could see Celius through the front window and he was wearing a brown coat and light-colored ball cap. Galle pointed out a man in viewing distance and suggested that he may be Celius. Backup officer Smith arrived at that time and the officers approached the man and asked for identification which revealed that the man was not Celius. The officers then returned to Galle's residence to gather more information.

At some point during Osterdyk's interview, Galle told him that Celius hung out at a convenience store. Osterdyk asked if she were talking about the one on Peoria (in a shopping center between 52nd and 54th Streets North on Peoria) and Galle said yes. Osterdyk testified that he then determined the most possible route Celius may have taken on foot to the convenience store on Peoria and proceeded along that route. When he did not see anyone matching the description on that route, Osterdyk headed west from the shopping center and at approximately 12:45 a.m., saw Goodlett on the south side of the street, a short distance from the shopping center and approximately a mile away from Galle's residence. Osterdyk testified that when he

saw Goodlett, a black man wearing brown coveralls and a light-colored cap with a bill,[1] he believed that he was the suspect[2] and pulled up next to him, shined the spotlight on him, rolled down his window and asked "Hey, what's your name?" Goodlett responded "Chris." Osterdyk asked if he had any ID on him and Goodlett responded "no." At that point, Osterdyk got out of the patrol car and approached Goodlett, whose body was turned slightly away from him. Smith was in a patrol car that had pulled behind Osterdyk's vehicle. As Osterdyk approached Goodlett he saw that Goodlett's coveralls were unzipped and he observed a "pistol grip handle with some red tape and what looked like a shotgun" inside the coveralls. Osterdyk then drew his gun, pointed it at Goodlett and told him not to move. Osterdyk told Goodlett to pull his right hand out of his pocket and not to move his left hand. After Smith cuffed Goodlett's right hand, Smith grabbed Goodlett's left hand while Osterdyk grabbed the shotgun. The shotgun had a shortened barrel and was loaded with one live round of ammunition in the chamber and three rounds in the magazine. Osterdyk then placed Goodlett under arrest, charging him with possessing a sawed-off shotgun. In conducting a search incident to the arrest, Osterdyk found two "crack pipes" in Goodlett's right coveralls' pocket.

**Analysis**

The Fourth Amendment protects the "right of people to be secure . . . against unreasonable searches and seizures." U.S. Const. amend. IV. Not all police-citizen encounters implicate the Fourth Amendment. *United States v. King*, 990 F.2d 1552, 1556 (10th Cir. 1993).

---

[1] The parties stipulated that Goodlett's property bag at the Tulsa County Jail did not contain a ball cap or hat.

[2] Osterdyk said he thought Galle could have mistaken the brown coveralls for a brown coat because she could only see Galle through the blinds of the front window.

3

Mere police questioning does not amount to a seizure and "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1028 (10th Cir. 1997). Generally, a person is considered "seized" when "considering all the surrounding circumstances, the police conduct 'would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.'" *Gallegos*, 114 F.3d at 1028 (quoting *Bostick*, 501 U.S. at 439).

If there has been a seizure, the Fourth Amendment requires that the seizure be reasonable. *United States v. Sharpe*, 470 U.S. 675, 682 (1985)(Fourth Amendment prohibits unreasonable seizures). The existence of probable cause is required for formal arrests to be reasonable. *Gallegos*, 114 F.3d at 1028. However, "[r]ecognizing that police officers must often act before probable cause can be determined, . . . the Supreme Court adopted an intermediate approach in *Terry* [*v. Ohio*, 392 U.S. 1 (1968)]," for an investigative detention or *"Terry* stop," which requires less than probable cause. *United States v. Perdue*, 8 F.3d 1455, 1461 (10th Cir. 1993). Un der such circumstances, a two-prong test is applied to determine the reasonableness of investigatory detentions.

First, the Court must decide if the detention was "justified at its inception." *United States v. Johnson*, 364 F.3d 1185, 1189 (10th Cir. 2004) (quoting *Terry*, 392 U.S. at 20). The government "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion." *Id*. (quoting *Terry*, 392

U.S. at 21). "Those facts must tend to show that the detainee had committed or is about to commit a crime." *Id*. "Neither 'inarticulate hunches' nor 'unparticularized suspicion' will suffice to justify an investigatory detention. *Gallegos*, 114 F.3d at 1028 (quoting *Terry*, 392 U.S. at 27). But "[t]he Fourth Amendment 'does not require police officers to close their eyes to suspicious circumstances.'" *Id*. (quoting *United States v. Espinosa*, 782 F.2d 888, 891 (10th Cir. 1986)).

Second, the officers' actions must be "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20; *Gallegos*, 114 F.3d at 1028; *Johnson*, 364 F.3d at 1189.

> *Terry* stops must be limited in scope to the justification for the stop. Officers may ask the detained individual questions during the *Terry* stop in order to dispel or confirm their suspicions, "[b]ut the detainee is not obliged to respond." Since police officers should not be required to take unnecessary risks in performing their duties, they are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain the status quo during the course of [a *Terry*] stop." An encounter between police and an individual which goes beyond the limits of a *Terry* stop, however, may be constitutionally justified only by probable cause or consent.

*Perdue*, 8 F.3d at 1462 (citations omitted).

Goodlett argues that he was "seized" for Fourth Amendment purposes when he yielded to Osterdyk's and Smith's show of authority by stopping and giving responses to Osterdyk's questions. He contends that the seizure was not justified at its inception as the officers had no "reasonable, articulable suspicion" that he had been engaged in any criminal activity: the officers did not verify the existence of a protective order; the description of the suspect they relied on was too general to satisfy the Fourth Amendment's requirement of a particularized and objective basis; Goodlett was wearing brown coveralls, not a brown coat;  the dispatcher told the officers

that Celius was wearing a blue shirt; and Goodlett was found approximately a mile away from Galle's residence within minutes of Galle's 911 call.

Regardless of whether Goodlett acquiesced to the officers' authority, the Court finds, based on the totality of the circumstances, that the officers had reasonable suspicion to stop and question him. *United States v. Harris*, 313 F.3d 1228, 1234 (10th Cir. 2002) ("When evaluating the validity of a *Terry* stop, 'the totality of the circumstances - the whole picture - must be taken into account.'").

First, it is clear from the undisputed evidence that Osterdyk and Smith were in the process of investigating criminal activity when they encountered Goodlett. At approximately 12:13 a.m. on November 28, 2006, Osterdyk responded to Galle's 911 call placed at 12:06 a.m. reporting that her ex-husband was attempting to break into her house in violation of a protective order.[3]   Osterdyk interviewed Galle who informed him that Celius had threatened to kill her and attempted to break in her front window. Galle told Osterdyk that she could see through her front window that Celius was wearing a brown coat and light-colored ball cap. Galle further informed Osterdyk that Celius "hung out" at a convenience store which Osterdyk verified was the one located in a shopping center on Peoria. The officers then left the scene and patrolled what Osterdyk determined was the most likely walking route to that convenience store, traveling east, north and then south. After exiting the south end of the shopping center and heading back west, Osterdyk spotted Goodlett walking, not far from the shopping center, approximately a mile from Galle's residence.

---

[3] The Court rejects Goodlett's argument that the officers were required to verify the existence of a protective order before further investigation as Galle reported that Celius was trying to break in her house and threatened to kill her. These latter acts also constitute criminal activity.

The Court further finds that the officers had reasonable, articulable suspicion to stop Goodlett in connection with that criminal activity. Goodlett was on foot in the vicinity of the convenience store which Galle identified as the place Celius "hung out."[4] And Osterdyk testified that Goodlett was wearing a light-colored ball cap and brown coveralls which he believed matched the description given by Galle because Galle could easily have mistaken the brown coveralls as a brown coat when she looked out through the window. Further, the time period between Galle's 911 call at 12:06 a.m., and 12:45 a.m. when the officers encountered Goodlett, and the approximate mile he would have had to have walked from Galle's residence to that location do not undermine the reasonableness of Osterdyk's suspicion that Goodlett was the suspect. Neither does the fact that the dispatcher identified the suspect as wearing a blue shirt, as the evidence is undisputed that Galle more particularly described Celius to Osterdyk as a black man wearing a brown coat and light-colored ball cap. "'A determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct.'" *Johnson*, 364 F.3d at 1194 (quoting *United States v. Arvizu*, 534 U.S. 266, 277 (2002)). As long as Osterdyk had a "particularized and objective basis" for suspecting that Goodlett may have been involved in the criminal activity, "he may initiate an investigatory detention even if it is more likely than not that [Goodlett] is *not* involved in any illegality." *Id*. The Court concludes that Osterdyk had that basis.

Goodlett does not specifically object to the scope of the detention. In any case, the Court

---

[4] Goodlett questions the reliability of the identification of the convenience store as he argued at the hearing that another convenience store was located closer to Galle's residence and Osterdyk was the one to suggest the convenience store on Peoria by asking Galle if she meant that store. Osterdyk testified that he suggested the Peoria store because Galle was upset, but that Galle confirmed that it was the store that Celius frequented.

also finds that the detention of Goodlett was properly "limited in scope to the justification for the stop." *Perdue*, 8 F.3d at 1462.  Osterdyk briefly detained Goodlett and asked him his name and for an ID.  *Oliver v. Woods*, 209 F.3d 1179, 1189 (10th Cir. 2000) ("The officer is also permitted to detain the individual until the investigation is completed.").  As Osterdyk approached Goodlett he observed the "pistol grip handle with some red tape and what looked like a shotgun" in Goodlett's coveralls.  At that point, Osterdyk took "reasonable precautions to protect his safety," drew his gun and, with Smith's assistance, secured the shotgun.  *Johnson*, 364 F.3d at 1194 ("An officer may take reasonable precautions to protect his safety during an investigative detention."); *United States v. Garcia*, 459 F.3d 1059, 1063 (10th Cir. 2006) ("During an investigative detention, '[p]olice officers are authorized too take reasonable steps necessary to secure their safety and maintain the status quo.'").  Under the circumstances, the officers' actions were reasonable.

In sum, the Court finds that if Goodlett were "seized" and thus entitled to the protections of the Fourth Amendment, his detention was "justified at its inception" and the officers' actions were "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20.   Therefore, the Court concludes that there is no violation of Goodlett's Fourth Amendment rights and recommends that the motion to suppress be **DENIED**. (Dkt. #9).

## Objections

The District Judge assigned to this case will conduct a de novo review of the record and determine whether to adopt or revise this Report and Recommendation or whether to recommit the matter to the undersigned.  As part of his review of the record, the District Judge will

consider the parties' written objections to this Report and Recommendation. A party wishing to file objections to this Report and Recommendation must do so within ten days from the date of this Report and Recommendation. See 28 U.S.C. § 636(b)(1) and Fed.R.Crim.P. 59(b). The failure to file written objections to this Report and Recommendation "waives a party's right to review." Fed.R.Crim.P. 59(b).

Dated this 2nd day of March, 2007.

_____
Paul J. Cleary
United States Magistrate Judge